# NO. 12-11-00370-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *SOUTHWESTERN ENERGY PRODUCTION COMPANY, APPELLANT/CROSS-APPELLEE* | § | *APPEAL FROM THE 123RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *TOBY BERRY-HELFAND AND GERY MUNCEY, APPELLEES/CROSS-APPELLANTS* | § | *SHELBY COUNTY, TEXAS* |

## *OPINION*

In this trade secret case, Southwestern Energy Production Company (Sepco) appeals a judgment for almost $40 million, including attorney's fees, rendered in favor of Toby Berry-Helfand and Gery Muncey after a jury trial. Sepco raises five issues on appeal. We reverse and render in part, affirm in part, and remand the cause for determination and award of attorney's fees due Sepco as the prevailing party in a suit brought under the Texas Theft Liability Act.

## BACKGROUND

Toby Berry-Helfand has a Master of Science degree in petroleum engineering with a minor in geology. Her primary professional experience has been as a reservoir engineer. Gery Muncey received a Bachelor of Science degree in geology from the University of Texas in 1981 and has been actively employed as a geologist in the oil and gas business since graduation.

### Helfand and Muncey's Study

Helfand conceived the idea of doing an extensive geological and engineering study of the potential for gas production from the James Lime formation underlying Nacogdoches, Shelby, Angelina, San Augustine, and Cherokee Counties. The James Lime is a formation 100 to 150 feet in width at an approximate depth of 9,000 feet. Some James Lime wells had been completed

in the five counties before 1997. However, few had been profitable because the formation typically has such low permeability that it reluctantly yields the hydrocarbons it contains. Helfand believed that the emerging horizontal drilling technology could make the James Lime very productive.

In November 1997, Helfand and Muncey embarked on a comprehensive program of research and analysis of all available material bearing on the James Lime in the 2,750,000 acre five county area. Their object was to precisely identify the most favorable locations for the recovery of natural gas from the James Lime using underbalanced horizontal drilling and fracturing. They also sought to identify the locations for "multiple stacked pays" in which a James Lime well would have the best chance of finding oil and gas in other formations. The effort was to consume all their time for the next three and one-half years.

Together Helfand and Muncey studied historical production data from 453 wells in the five counties, including thirty-three James Lime vertical wells. They researched and analyzed electric logs, 187 porosity logs, and 128 density neutron logs. Helfand prepared a cross-section of the James Lime formation for all the wells that had a porosity log and annotated in detail a geological structure map for the wells. Using her methodology, Helfand and Muncey identified nineteen prospects, later refined to ten, favorable for the production of oil and gas from the James Lime and multiple stacked pays. The research and analysis of the production data and logs, and the preparation of spreadsheets, cross-sections, and geomaps, required thousands of hours. Although most of the information they used in their analysis was gleaned from the public records, the evidence shows that theirs was probably the most detailed and comprehensive study ever made of the James Lime in the five county area.

In 2000, David Michael Grimes drilled the Chandler #1 Well in Nacogdoches County in the Black Bayou prospect that Helfand had identified as a James Lime sweet spot using her methodology. Helfand, Muncey, and Grimes were partners in the well. The Chandler #1 was a failure.

In April 2001, Muncey ceased to work with Helfand. However, he remained in contact with her, and, he testified, he retained a 20% interest in the results of their joint research and the methodology derived from it.

In 2003, Helfand met another geologist, Leon Wells, who agreed to help her in conducting further research and in refining her methodology. During 2003 and 2004, they

2

researched and analyzed data from 100 new wells drilled after Muncey had left the project. They named their partnership "Team Works." Helfand had a 60% interest, Wells a 20% interest, and Anderson, their title lawyer and lease agent, a 20% interest. By 2004, they had identified two promising locations where leases were available—Pearson and Pearson Northeast. With money from investors, they began leasing with the object of selling, for cash and an overriding royalty interest, a drill-ready prospect, preferably to an exploration company large enough to develop with Team Works its other identified sweet spots.

## Sepco's Activity

During 2002 and 2003, Carl Knudson, a Sepco geologist, had conducted an exploratory study of the James Lime trend extending into Louisiana studying the public information available for all the James Lime wells drilled in the area up until that time. Knudson concluded that the James Lime was not a profitable play for Sepco to pursue. In 2003, Sepco had declined to participate in an East Texas Horizontal James Lime play proposed by Sonerra Resources. In April 2004, Jeff Wells, Leon Wells's son, went to work for Sepco as a petroleum engineer. Wells was aware that his father, Leon, and Helfand were putting together the Pearson and Pearson Northeast prospects. Sometime during July 2004, he told Helfand that Sepco might be interested in their James Lime prospects. He learned, however, that at that time, Sepco had no interest in the James Lime. They had never drilled a James Lime well but were actively exploring the deeper Travis Peak formation and continuing to develop the Cotton Valley formation in the Overton field.

Within the same month that Jeff Wells made Sepco's initial contact with Helfand, Sepco concluded an Area of Mutual Interest agreement (AMI) with Endeavor Natural Gas covering a 360 square mile area in Cherokee, Nacogdoches, and Angelina Counties. The northern boundary of the AMI with Endeavor was just south of the city of Nacogdoches. The AMI did not include the two Pearson prospects but did include five of the sweet spots for James Lime development identified by Team Works. At this point, Team Works had not presented Sepco with the results of its research and analysis identifying the sweet spots for James Lime development.

During the autumn of 2004, Team Works attempted to interest Patriot Resources, Par Minerals Synergy, Winn Exploration, Adams Resources, and Chalker Energy in its Pearson prospects. In their presentations to Patriot Resources, Team Works provided almost the same information shown later in their offer to Sepco. A meeting at the North American Prospects

3

Expo (NAPE) in January 2005 between Sepco's chief landman, Jon Pruett, and Helfand, Wells, and Anderson (Team Works) led to Team Works' presentation to Sepco. Before the presentation, Team Works asked Sepco to sign a confidentiality agreement regarding the materials to be presented on February 15, 2005. Sepco asked that the term be shortened to one year and the AMI be restricted to the land shown in Exhibit "A," the Pearson prospects. Team Works agreed.

The confidentiality agreement obligated Sepco (1) to use the confidential information provided by Team Works solely for evaluation of the Pearson prospects, (2) not to disclose the information to third parties, and (3) not to acquire any leases "within the area identified on Attachment 'A' (the Pearson prospects) unless it acquires such interest through Team Works."

At the conclusion of the February 15, 2005 meeting, Sepco asked for time to consider Team Works' proposal. A couple of weeks later, Sepco asked for more information. Team Works promptly provided additional maps and data. But by early April, Team Works had received no acceptance of its offer. In May, Sepco returned the material it had received from Team Works and declined to participate in the Pearson prospects. Shortly thereafter, Helfand made a presentation to Petrohawk. Petrohawk purchased the Pearson prospects from Helfand for $1.8 million and an overriding royalty interest. Helfand and Petrohawk also entered a Prospect Identification Agreement covering Nacogdoches, Shelby, and Angelina Counties. By this agreement, Petrohawk retained Helfand to locate prospects in the three counties for $15,000 per month for six months, and, for any prospect in which Petrohawk elected to participate, an overriding royalty dependent upon the existing royalty burden and a 6.25% "back in" working interest. Petrohawk's initial well in the Pearson prospect was not a success. Sepco continued to drill wells to the deeper Travis Peak formation under its July 2004 agreement with Endeavor.

In 2006, Sepco bought a large block of leases in Shelby and San Augustine Counties from Exxon. The purchase agreement required Sepco to drill four wells within the next eighteen months. In drilling to the deeper targeted Travis Peak formation, the well logs revealed natural gas in the James Lime.

The Exxon purchase gave Sepco holdings bordering Cabot Oil and Gas. In order to drill a horizontal James Lime well without trespassing under Sepco's acreage, Cabot agreed to give Sepco 15% ownership in a proposed well and access to all data. The Cabot well was very successful. Sepco then drilled its first James Lime well in October 2007.

4

Sepco continued to lease land in the five county area in addition to its Exxon acquisition and Endeavor agreement. Virtually all the leases taken by Sepco after Team Works' February 2005 presentation were in the area of Helfand's top ten identified sweet spots. After the success of its initial James Lime horizontal well in October 2007, Sepco drilled or participated in over eighty James Lime wells. All of them were successful, and all were clustered in and around Helfand's sweet spots identified in Team Works' presentation. A substantial number of other wells producing from the Travis Peak were also drilled in Helfand's designated sweet spots. By the time of trial, the revenues from these 144 wells would amount to approximately $382 million.

On June 30, 2010, Sepco sold the producing rights to the Haynesville and Middle Bossier Shale formations underlying certain of its holdings in Shelby and San Augustine Counties to Exco for $355 million. Sepco retained the drilling and producing rights to all other depths in the acreage, including the James Lime, Pettet, Travis Peak, and Cotton Valley formations.

**The Lawsuit**

On March 13, 2006, Helfand filed this lawsuit alleging fraud and misappropriation of her trade secret (her proprietary information relating to the James Lime formation) against Endeavor Natural Gas and four individuals, including Grimes, her partner in drilling the "bungled" Chandler #1 well in 2000, and Leon Wells, her erstwhile partner in Team Works. Muncey intervened in the lawsuit claiming an interest in the trade secret. Over the next two years, Helfand sued more than a dozen other entities, but not Sepco, urging the same or similar allegations.

For over two years, Sepco remained uninvolved in Helfand and Muncey's lawsuit against a growing number of oil and gas operators. However, in November 2008, two of the defendants moved for leave to designate Sepco as a responsible third party. Helfand objected, contending "the defendant did not plead sufficient facts concerning the alleged responsibility [of Sepco] to satisfy the pleading requirement of the Texas Rules of Civil Procedure." The trial judge returned the order designating responsible third parties unsigned. However, in February 2009, Helfand and Muncey added Sepco as a defendant making much the same claims against Sepco that they had asserted against the other defendants. Although Sepco had been a party defendant since February 2009, the trial judge signed an order in July 2009 granting leave to designate Sepco and other parties already defendants as responsible third parties.

5

Helfand and Muncey settled with all of the defendants but Sepco and Wells immediately prior to trial. The trial court excluded any evidence of, or cross examination regarding, Helfand's prior pleadings in which she accused fifteen other parties of stealing her trade secret.

The jury found that Helfand and Muncey's study constituted a trade secret and found against Sepco on all five of the liability theories submitted: (1) common law trade secret misappropriation, (2) statutory theft of a trade secret, (3) breach of fiduciary duty, (4) fraud, and (5) breach of contract. The jury found that actual damages were $11,445,000 and that Wells was not liable to Helfand or Muncey.

The trial court granted judgment for the amount of the actual damage verdict and added $23,888,000 in disgorgement of illicit gains. The trial court also awarded $4,578,000 (40% of the damage award) in attorney's fees plus prejudgment interest. The judgment totals approximately $40 million.

## SUFFICIENCY OF THE EVIDENCE

In its first issue, Sepco contends the evidence does not support the jury's affirmative findings on any of the five liability theories submitted.

### Standard of Review

When a party attacks the legal sufficiency of the evidence to support an adverse jury finding on an issue for which it did not have the burden of proof at trial, it must show that no evidence supports the jury's adverse finding. ***Exxon Corp. v. Emerald Oil & Gas Co., L.C.***, 348 S.W.3d 194, 215 (Tex. 2011). The test for legal sufficiency of the evidence to support a fact is whether the evidence would enable reasonable and fair-minded people to determine the fact exists. *See **City of Keller v. Wilson***, 168 S.W.3d 802, 827 (Tex. 2005). The reviewing court considers the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. ***Id***. A "no evidence" challenge must be sustained when the record discloses a complete absence of evidence of a vital fact, the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a scintilla, or the evidence conclusively establishes the opposite of a vital fact. ***Id***. at 810.

6

When challenging the factual sufficiency of the evidence supporting an adverse finding upon which the appealing party did not have the burden of proof, the appellant must demonstrate there is insufficient evidence to support the adverse finding. *McIntyre v. Comm'n for Lawyer Discipline*, 169 S.W.3d 803, 806 (Tex. App.–Dallas 2005, pet. denied). We review the factual evidence in a neutral light, and we will set the verdict aside "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). However, this court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 Tex. 1989); Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 1, 31 (2010). In reviewing a "matter of law' challenge, the reviewing court must first examine the record for evidence that supports the adverse finding, crediting favorable evidence, if a reasonable fact finder could, and disregarding evidence to the contrary, unless a reasonable fact finder could not. *See Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *Sterner*, 767 S.W.2d at 90; Hall, 42 ST. MARY'S L.J. at 32. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690; Hall, 42 ST. MARY'S L.J. at 31-33. The issue should be sustained only if the contrary proposition is conclusively established. *City of Keller*, 168 S.W.3d at 816.

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); Hall, 42 ST. MARY'S L.J. at 42. The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 242. In doing so, the court of appeals must "detail the evidence

7

relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

Circumstantial evidence can be used to prove any material fact, but it must transcend mere suspicion. *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). The material fact must be reasonably inferred from the known circumstances. *Joske v. Irvine*, 44 S.W. 1059, 1064 (Tex. 1898). Each piece of circumstantial evidence must be viewed, not in isolation, but in the light of all the known circumstances. *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001).

The equal inference rule provides that a jury may not reasonably infer an ultimate fact from "meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Id*. at 148 (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). "Thus, in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence." *Id*.

"[C]ircumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it." *Id*. Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. *Id*. (citing *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 757 (Tex. 1975)). "And this choice in turn may be influenced by the fact finder's views on credibility. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 797 (1951). Thus, a jury is entitled to consider the circumstantial evidence, weigh the witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe." *Lozano*, 52 S.W.3d at 148.

### A. BREACH OF FIDUCIARY DUTY

Sepco maintains that its confidentiality agreement did not create a fiduciary relationship with Helfand, and that there is no evidence that such a relationship existed between Sepco and Helfand prior to the signing of the confidentiality agreement. Helfand argues that, in assuming the duty of confidentiality to Helfand in regard to her proprietary information, Sepco entered into a confidential relationship that is the equivalent of a fiduciary relationship. Therefore, she maintains the confidentiality agreement created a fiduciary relationship as a matter of law.

8

**Applicable Law**

Certain relationships such as that between attorney and client, principal and agent, partners, and executors and estate beneficiaries give rise to a fiduciary relationship as a matter of law. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199-200 (Tex. 2002); *Crim Truck & Tractor v. Navistar Int'l Transport. Co.*, 823 S.W.2d 591, 593-94 (Tex. 1992). "An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997). But for an informal fiduciary relationship to exist, the party claiming the relationship must have been accustomed to being guided by the judgment or advice of the other. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). The duties imposed on a fiduciary are rigorous and exacting, encompassing the onerous burden on the fiduciary to place the interest of the other party before his own. *Crim Truck*, 823 S.W.2d at 594. Our supreme court has been reluctant to impose such a burden in otherwise arms-length business transactions. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998). In *Schlumberger*, the court stated, "[I]n order to give full force to contracts, we do not create such a relationship lightly." 959 S.W.2d at 177. "[M]ere subjective trust does not . . . transform arms-length dealing into a fiduciary relationship." *Id*. In order to impose an informal fiduciary duty in a business transaction, "*the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit.*" *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (emphasis added); *Morris*, 981 S.W.2d at 675; *Assoc. Indem. Corp. v. CAT Contracting*, 964 S.W.2d 276, 288 (Tex. 1998); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995).

**Discussion**

Helfand relies on *Hyde Corp. v. Huffines*, 314 S.W.2d 763 (Tex. 1958). In that case, the Hyde Corporation initiated negotiations with Huffines with the object of obtaining a license to manufacture and sell a garbage compressor that Huffines had developed. *Id*. at 766. As a result of the negotiations and the licensing agreement that followed, Hyde acquired complete knowledge of the design of Huffines. *Id*. at 768. The licensing agreement contained no explicit provision precluding Hyde from making use of this information after cancellation of the licensing agreement. *Id*. at 769.

9

During the second year of operations under the contract, Hyde repudiated the agreement. *Id*. at 768. It discontinued paying royalties to Huffines, but continued to manufacture and sell the machine. *Id*. at 768, 769. Huffines sued for the unpaid royalties on the machines produced after Hyde's repudiation. *Id*. at 765. He also sought a permanent injunction restraining Hyde from manufacturing his device. *Id*.

The jury found that Huffines had disclosed his machine's design to Hyde because Hyde represented to him that it was interested in manufacturing and selling the mechanism. *Id*. at 768. But the jury also found that Hyde had acted in good faith in acquiring knowledge of the machine's design. *Id*. The trial court entered judgment in the amount of the royalties due and issued a permanent injunction restraining Hyde from manufacturing the machine. *Id*. at 765.

Hyde contended on appeal that since there was no express agreement that the disclosures made to it by Huffines were made in confidence, and, since the jury had found that Hyde had acted in good faith in obtaining the device's design, Huffines was not entitled to royalties on the machines produced after Hyde's cancellation of the agreement. *Id*. at 769. On the same grounds, Hyde also insisted that Huffines was not entitled to a permanent injunction restraining it from manufacturing the machine. *Id*. at 772.

The supreme court concluded that, even in the absence of an express promise of confidentiality in their agreement, there arose a confidential relationship out of the parties' negotiations and licensing agreement. *Id*. at 769-70. One of the usual incidents of confidential relations is the implicit obligation of the parties not to abuse the trust inherent in their confidential relationship. *See id*. at 770, 772. The court held that Hyde breached that trust by using Huffines's confidential disclosures adversely to him. *Id*. The court affirmed the damages and injunctive relief, although there had been no explicit promise of confidentiality in the licensing agreement and although Hyde had originally entered into the relationship in good faith. *Id*. at 765. But the court did not hold that Hyde was a fiduciary, even though it concluded that an implied promise of confidentiality arose out of the circumstances accompanying the parties' negotiations and agreement.

Helfand has also cited an unpublished Fifth Circuit case in which the court states that "Texas courts have long recognized that entrustment of trade secrets gives rise to a fiduciary relationship." *In re Associated Indep. Marketers Inc. of Am.*, 1 F.3d 1237, at *3 (1993). However, in all the cases, other than *Hyde*, that the court cited to support that proposition, all the

10

defendants were employees already in a fiduciary relationship with the injured party at the time they acquired the trade secret they misused. *See id*. at *3 n.20. That is not the situation here.

It must be conceded that there is some ambiguity in the case law created when courts characterize fiduciary relationships as confidential relationships or use the terms interchangeably. But they are not synonymous. Some confidential relationships are fiduciary; some are not. "Not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Schlumberger*, 959 S.W.2d at 176-77. We have reviewed *Hyde* and its progeny as well as the other cases bearing on the question. Confidentiality is a usual incident of fiduciary relationships. Fiduciary relationships can be properly characterized as confidential relationships. But the converse is not true. All confidential relationships are not fiduciary.

The court in *Anglo-Dutch Petroleum International v. Smith*, 243 S.W.3d 776 (Tex. App.–Houston [14th Dist.] 2007, pet. denied), addressed the appellant's contention that an informal fiduciary relationship was created by the parties' execution of a confidentiality agreement. In doing so, the court rejected Smith's position stating, "[W]e have found no authority supporting the notion that confidentiality agreements can create fiduciary relationships." *Id*. at 782.

Similarly, in the case at bar, the parties dealt at arms length. Their agreement expressly defined and limited Sepco's obligation of confidentiality regarding Helfand's trade secret. There is no reason or valid precedent to infer a fiduciary relationship from their negotiations or confidentiality agreement. There is no evidence that a special relationship of trust and confidence existed between Helfand and Sepco "prior to and apart from the [confidentiality] agreement made the basis of the suit." *See Meyer*, 167 S.W.3d at 331. Therefore, no fiduciary relationship arose from their agreement.

Sepco's first issue, as it relates to Helfand's breach of fiduciary relationship claim, is sustained.

## B. FRAUD

Sepco claims the fraud findings have no support in the evidence.

11

**Applicable Law**

A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material representation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the plaintiff would act on that representation or intended to induce the plaintiff's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp.*, 348 S.W.3d at 217. An actionable misrepresentation must concern a material fact. *Faircloth*, 898 S.W.2d at 276. Generally, a mere expression of opinion will not support an action for fraud. *Id*. In the context of fraud, a fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question. *Custom Leasing, Inc., v. Tex. Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex. 1974). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). The evidence to prove the defendant's intent must be relevant to the defendant's intent at the time the misrepresentation was made. *Id*. However, mere failure to perform a contract is not evidence of fraud. *Id*.

As a general rule, a failure to disclose information is not actionable fraud unless there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). "[S]ilence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak, and [the party] deliberately remains silent." *Id*. The breach of the duty of full disclosure by a fiduciary is tantamount to fraudulent concealment. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.–Tyler 2000, pet. denied) (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)). "Whether such a duty exists is a question of law." *Bradford*, 48 S.W.3d at 755.

Fraud is not actionable until relied upon to the detriment of the person to whom the representations were made. *Stein v. Deason*, 165 S.W.3d 406, 414 (Tex. App.–Dallas 2005, no pet.). The plaintiff's reliance must have been justifiable. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

**Discussion**

In her brief, Helfand maintains that three representations were fraudulent.

12

First, she claims that Sepco misrepresented to her that it would not entertain a presentation regarding the Pearson prospects if it was pursuing a competitive position. She argues Team Works would not have made its February 15, 2005 presentation to Sepco if she had known Sepco had a competitive position in the area. In early July 2004, Sepco concluded an AMI with Endeavor Natural Gas, L.P. after six months of negotiations. The north boundary of the 360 square mile AMI ran just south of the city of Nacogdoches. It did not include the Pearson prospects. Sepco finalized the AMI six days before Jeff Wells, recently hired as a reservoir engineer with Sepco, first contacted Helfand about the Team Works prospects that he had heard about from his father.

The representation alleged to constitute actionable fraud is contained in a July email to Helfand from Jeff Wells.

> Also the last thing would be if you guys [Helfand and Jeff's father, Leon] have a Confidentiality Agreement/area – just to know the extent of that – in some few cases we have chosen to decline looking at deals because we realized we were too close in the area already competing and did not want to be dishonest.

On August 26, Jeff sent an email to his father, a partner in Team Works.

> I also mentioned your prospect again to my landman [Jon Pruett] and geologist and I think they are just concerned about the perception or management might have to learn that you are involved in a play in a similar proximity to an area that we were already working. That may sound a little crazy, but as I mentioned before, these mgrs. are a little crazy. They would rather just pass on the deal.

Other than a chance November encounter, there was no further communication between Team Works and Sepco until the NAPE meeting in Houston in January 2005. At the NAPE meeting, Sepco agreed to consider Team Works' Pearson prospects. In preparation for an anticipated February meeting with Sepco, Team Works presented Sepco with a draft confidentiality agreement. Sepco insisted that the area covered by the agreement be limited to the Pearson prospects and that it be free to compete outside that area. Helfand and Wells, partners in Team Works, agreed to the changes proposed by Sepco.

The representation Helfand relies upon to show fraud was Jeff Wells's statement in his July email to Helfand that Sepco "in some few cases [has] chosen to decline looking at deals because we realized we were too close in the area already competing and did not want to be

13

dishonest." Helfand asserts the statement was false and calculated to lure Helfand and Team Works into the February 15, 2005 meeting six months later so that it could steal her methodology.

We have examined the voluminous record carefully, and we can find no evidence that the statement was false when it was made. Nor is there any proof that Helfand relied on it or that it played any role in her pursuit of a deal with Sepco. There is an abundance of evidence that she knew of Sepco's activity in the five counties. She knew Sepco had drilled the Reavley No. 1 Well just south of the Pearson prospects. She knew that Sepco was "leasing up and drilling up acreage with interest in the Travis Peak and Cotton Valley" (formations below the James Lime). It was Sepco's size, expertise, and activity in the five counties that attracted her.

Helfand contends that after promising it was nearing a Pearson deal with her, Sepco told her that her prospects failed its economic criteria; yet behind the scenes it was gearing up to fully exploit the secrets in other sweet spots.

Sepco's refusal to participate in Team Works' Pearson prospects was entirely consistent with its previous attitude toward the James Lime. Its in-house study, the Knudson Report, assigned a low priority to James Lime exploration. Sepco had declined to participate in Sonerra's much larger James Lime program in 2003. But even if we assume, for the sake of argument, that after their February 15, 2005 meeting, Sepco misrepresented its intention to abstain from the James Lime, there is no proof that Team Works or Helfand relied on that representation. Within a month and a half after the meeting with Sepco, Helfand offered the Pearson prospects to Petrohawk. Petrohawk bought the Pearson prospects for $1.8 million and concluded a consulting agreement with her. Not only was there no reliance by Helfand on Sepco's alleged misrepresentation of its drilling program, but there was no injury.

Next, Helfand claims that "Sepco cajoled its partner, Endeavor, to seek a Pearson foothold under false pretenses." This refers to a communication from Sepco's landman to his counterpart at Endeavor in April 2005 that Helfand had a James Lime prospect in which Endeavor might be interested. Sepco's landman asked that Endeavor not mention that it had heard about the prospect from Sepco but rather that it had heard about it "on the street." Why Sepco's landman did not want to be disclosed as a source is a mystery not explained elsewhere in the testimony. Team Works had made some sort of presentation of the Pearson prospects to at

14

least seven oil and gas operators. So it was no secret. The statement was not false. Moreover, Endeavor never contacted Helfand or Team Works.

Finally, Helfand insists that "Sepco misrepresented the basis of its drilling program. Helfand does not set forth a specific misrepresentation or when it was made. We take her argument to mean that Sepco misrepresented its lack of interest in the James Lime. Before February 15, 2005, there is no evidence to contradict Sepco's position that it was uninterested in James Lime exploration. If the alleged misrepresentations took place after February, there is no evidence that she relied on them.

In her argument, Helfand points to other duplicitous conduct by Sepco that she considers fraudulent. While some of the acts are perhaps relevant to proof of Sepco's misuse of Helfand's trade secrets, Helfand has not shown that any satisfy the elements necessary for proof of fraud. Even if we assume that Sepco breached its contract, nothing but surmise supports Helfand's assertion that Sepco entered the contract with that intention. Mere failure to perform a contract is not evidence of fraud. *See Formosa*, 960 S.W.2d at 48.

Helfand also claims Sepco committed fraud by nondisclosure. She contends that Sepco's failure to reveal its AMI and partnership with Endeavor constituted fraud by concealment. She claims that she was assured by Jeff Wells's emails to her and his father that Sepco did not consider deals where it was competing in the same area. Without that assurance, she claims, she would not have made her presentation to Sepco. She contends that Sepco's nondisclosure of the AMI was part of Sepco's scheme to induce her to sign the confidentiality agreement so that it could gain access to her trade secret. In Helfand's view, Sepco's nondisclosure of the AMI was a breach of the fiduciary duty it owed her.

No fiduciary relationship existed between Helfand or Team Works and Sepco. The so-called false assurance was contained in an email from Jeff Wells, a recently hired engineer for Sepco, to Helfand, his father's partner in Team Works. In pertinent part, it read that "in some few cases we have declined looking at deals because we realized we were too close in the area already competing and didn't want to be dishonest." The confidentiality agreement negotiated by Team Works and Sepco covered only the Pearson prospects. The Endeavor AMI did not include the Pearson prospects. When Helfand and Team Works presented the Pearson prospects at their February 15, 2005 meeting, Helfand was well aware that Sepco was leasing and drilling

15

relatively close to the Pearson prospects. Sepco was under no duty to disclose the Endeavor AMI to Helfand.

In all of Helfand's allegations of fraud, there is a complete absence of evidence of one or more of the elements necessary to support a finding of fraud.

Sepco's first issue, as it regards Helfand's fraud claim, is sustained.


## C. TRADE SECRET THEORIES

Sepco challenges the sufficiency of the evidence supporting the jury's findings on Helfand's trade secret theories—common law misappropriation of a trade secret, theft of a trade secret, and breach of contract. The first question we must address, however, is whether the data and analysis Helfand and Team Works presented to Sepco constituted a trade secret.

### Applicable Law and the Jury's Finding

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). There must be a substantial amount of attendant secrecy for information to be a trade secret. *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex. App.–Dallas 1993, no writ). "[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[] affords a competitive advantage, is a protected trade secret." *Fourtek, Inc*., 790 F.2d at 1202. Information related to oil and gas exploration and production is frequently treated as a trade secret within the industry and at law. *Bass*, 113 S.W.3d at 742. A trade secret is not necessarily destroyed by a disclosure, but, in disclosing a trade secret, the owner must establish a confidential relationship with the other party, by contract or otherwise, or the secret will be lost by the disclosure. *Furr's, Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. App.–El Paso 1964, writ ref'd n.r.e.). Texas law adopts the Restatement definition of what constitutes a "use."

> Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."

16

***Bohnsack v. Varco, L.P.***, 668 F.3d 262, 279 (5th Cir. 2012) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c. 1995).

Helfand and her partners studied the production history from six hundred wells in a six county area. Helfand researched and analyzed the wells' electric logs and porosity logs as well as density neutron logs for the wells that had them. She prepared a cross-section of the James Lime formation for all the wells with a porosity log. She annotated a structure map for the wells. Her analysis of this data together with the preparation of cross-sections, geomaps, and spreadsheets required thousands of hours of work over a period of several years. Her analysis led her to identify nineteen sweet spots (later refined to ten) most favorable for James Lime production, but also for multiple stacked pays. Although the raw data was drawn from public or semi-public sources, there is abundant evidence to support the jury's finding that this massive compilation and analysis was a trade secret.

Helfand and Team Works shared this material with other prospective oil and gas operators, but the evidence shows that these disclosures were conditioned on the execution of confidentiality agreements. The evidence supports the jury's implicit finding that her compilation of data, its analysis, and the methodology derived from it did not lose its trade secret status through disclosure.

## 1. MISAPPROPRIATION

Sepco maintains that even if Helfand's proprietary materials are considered a trade secret, there is insufficient evidence to show that it misappropriated the trade secret by unauthorized use.

**Applicable Law**

A trade secret misappropriation under Texas law requires (1) the existence of a trade secret, (2) a breach of a confidential relationship or improper discovery of the trade secret, (3) use of the trade secret, and (4) damages. ***Id***.; ***Trilogy Software, Inc., v. Callidus Software, Inc.***, 143 S.W.3d 452, 463 (Tex. App.–Austin 2004, pet. denied); ***IBP, Inc. v. Klumpe***, 101 S.W.3d 461, 476 (Tex. App.–Amarillo 2001, pet. denied). Proof of trade secret misappropriation often depends upon circumstantial evidence. ***SI Handling Sys., Inc. v. Heisley***, 753 F.2d 1244, 1261 (3d Cir. 1985).

**Arguments and Evidence**

Sepco argues that Helfand's case, reduced to its essence, rests solely on the fact that Sepco had no James Lime wells before it met with Helfand in February 2005 and three years later it had over eighty. Sepco insists that it is not reasonable to infer from this sequence of circumstances that Sepco's success was the consequence of what it learned from the data and analysis provided by Helfand at the February 2005 presentation or from the additional material she provided later. Sepco asserts that Helfand failed in her burden to show that the inferences necessary to the conclusion that Sepco misappropriated her trade secret were reasonable in the light of the entire record.

Such a conclusion is "legally impossible," it claims, if one considers that (1) Sepco had ongoing operations in East Texas before it met Helfand; (2) by 2003, the James Lime was a known producing formation; (3) Sepco declined to participate with Sonerra in a James Lime project in 2003 based on its Knudson study; (4) Sepco started pursuing Travis Peak exploration in 2004 and some of its leases do not include James Lime rights; (5) Sepco continued extensive Travis Peak drilling after the February 2005 meeting at a cost close to $80 million.

Sepco explained that it learned a lot about the James Lime by drilling through it while carrying out its extensive Travis Peak program beginning in 2004. The potential of the James Lime was demonstrated by the success of the Cabot well. Sepco offered plausible explanations for its eager pursuit of James Lime development after its meeting with Helfand.

Sepco acknowledges that, prior to the February 15, 2005, it had no interest in the James Lime, because it believed the formation offered little profit potential. Sepco had drilled no James Lime wells before the meeting with Helfand. Sepco's skepticism regarding the James Lime was assumed to be the basis of Sepco's refusal to participate in the Pearson projects.

However, within months of Helfand and Team Works' presentation, Sepco designated the James Lime as an objective in internal drilling documents. Sepco prepared a map of the James Lime in the East Texas Basin in November 2005. Sepco maps show markings in the same places as her sweet spots. During the year following Helfand's presentation and during the term of the confidentiality agreement, Sepco took many leases that included James Lime drilling rights. Nearly all closely matched Helfand's sweet spots. By trial, Sepco had taken approximately 1,800 leases, virtually all in Helfand's sweet spots. Out of Helfand's top ten sweet spots, Sepco had taken leases in them all.

18

One of the chief reasons behind Sepco's disinclination to drill in the James Lime was the formation's poor history. Sepco began its large scale drilling program in the James Lime in 2007, two years after the presentation of Helfand's trade secret. There was testimony from Sepco's witnesses that this was approximately the time that would have been required for a drilling program exploiting Helfand's secrets to be implemented. Sepco drilled or participated in over eighty James Lime wells with a 100% completion rate. Helfand's sweet spots occupy a tiny fraction of the 2.75 million acres in the counties involved in Helfand's study. But the wells in question cluster in and around Helfand's designated sweet spots.

Sepco claims that the locations chosen were the product of Sepco's in-house study of the James Lime that only coincidentally lead it to drill in Helfand's sweet spots. The study, Sepco acknowledges, was led by Sepco employees who attended Helfand's presentation. Helfand argues that Sepco's research and analysis of the James Lime identifying the stacked-pay sweet spots, if truly independent of her research and methodology, would have required years of coordinated effort and left an unmistakable paper trail. A huge amount of documentation supported Helfand's research, analysis, and the methodology derived from it. However, there was no evidence in Sepco's records of such a massive engineering effort. Sepco's petroleum engineer claimed the working documents from the study had been destroyed. The improbability that Sepco would destroy such an important study while in the midst of a drilling program based on it reasonably justifies at least two inferences: (1) an independent study had never been made, or (2) the study would have shown Sepco's analysis to have been a mere attempt to corroborate Helfand's secrets and accelerate the development of its James Lime program; therefore, the discarded study would have supported Helfand's case.

Sepco maintains that its interest in the James Lime was ignited by a very successful well drilled by Cabot in which Sepco had a 15% interest. Sepco claims the proximity of other Cabot James Lime wells required it to develop the James Lime in its adjacent leases to prevent drainage. However, Sepco failed to offer proof of an implied obligation to protect from drainage by proving (1) actual drainage, and (2) that a reasonably prudent operator would drill an offset well. *See **Amoco Prod. Co. v. Alexander***, 622 S.W.2d 563, 567-68 (Tex. 1981). Sepco's petroleum engineer, Van Slambrouck, testified that "some" of those wells may "perhaps" have been drilled "in part" to prevent drainage. However, Sepco's lease map showed that the great majority of the Sepco and Cabot acreage was not in communication or competition.

19

**Analysis**

Helfand's case, as in many, if not most trade secret misappropriation cases, rests on circumstantial evidence. *See **Heisley***, 753 F.2d at 1261. The circumstantial evidence supporting Helfand's claim amounts to more than what Sepco characterizes as an unsupported "before and after argument," "0 James Lime wells before February 15, 2005, 80 wells later."

Despite a well recorded aversion to James Lime drilling before meeting Helfand, shortly thereafter Sepco zealously pursued James Lime opportunities that coincided with Helfand's sweet spots. During the year that followed its meeting with Helfand, Sepco designated the James Lime as a drilling objective, mapped the James Lime, and marked at least one of its maps in places that coincided with Helfand's sweet spots. Sepco launched an ambitious leasing program that included the James Lime. Although Helfand's sweet spots cover only a miniscule portion of the 2.5 million acres included in her five county study, most of Sepco's leases were in or very close to the prime locations she had designated. The more than eighty successful James Lime wells that began to appear in 2007 were in or near Helfand's sweet spots. The drilling of the James Lime wells began after an interval normally required to implement a drilling program conceived in 2005. Sepco could not produce a body of independent research remotely comparable to Helfand's to explain its drilling site selection. The jury would have been justified in regarding as implausible Sepco's explanation that it threw away all copies of such a significant study in the midst of a large drilling program implementing it.

We have reviewed the lengthy record. We conclude that it was not unreasonable for the jury to infer from the circumstances that, during the year following Sepco's meeting with Helfand, Sepco used her data and analysis, not solely to evaluate the Pearson prospects, but to plan, map, and lease in preparation for a vast James Lime drilling program. It was also not unreasonable for the jury to infer that the spectacular success of that program, although not visible till later, related back to and was the product of information Sepco obtained from that misappropriation. The jury heard the testimony and was in the best position to gauge the credibility of the witnesses. The jury was entitled to consider the circumstantial evidence, weigh the witnesses' credibility, and make reasonable inferences from the evidence it chose to believe. *See **Lozano***, 52 S.W.3d at 148-49. The evidence is both legally and factually sufficient to support the jury's finding that Sepco misappropriated Helfand's trade secret. Sepco's first issue,

20

as it relates to the sufficiency of the evidence to support Helfand's trade secret misappropriation claim, is overruled.

## 2. THEFT OF A TRADE SECRET

Sepco also maintains there is no evidence to support the jury's finding that Sepco committed theft of Helfand and Muncey's trade secret.

**Applicable Law**

A person commits theft of a trade secret if, without the owner's consent, he knowingly (1) steals a trade secret, (2) makes a copy of an article representing a trade secret, or (3) communicates or transmits a trade secret. TEX. PENAL CODE ANN. § 31.05(b) (West 2011). "Steal" means to acquire property or service by theft. *Id*. § 31.01(7) (West 2011). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. *Id*. § 31.03(a) (West 2011). Appropriation is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b)(1) (West 2011). Consent is not effective if it is induced by deception or coercion. *Id*. § 31.01(3)(A) (West 2011). "Deprive" means

> (A) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner;
> (B) to restore property only upon payment of reward or other compensation; or
> (C) to dispose of property in a manner that makes recovery of the property by the owner unlikely.

*Id*. § 31.01(2) (West 2011). The defendant's intent to deprive the owner of the property must exist at the time the property was taken. ***Wirth v. State***, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012).

The definition of "trade secret" in the penal code is consistent with its definition in the civil context. *Compare* TEX. PENAL CODE ANN. § 31.05(a)(4) (West 2011) *with **In re Bass***, 113 S.W.3d at 739. Under the Texas Theft Liability Act, a person who sustains damages resulting from the unlawful appropriation of property proscribed by penal code Section 31.05 may recover actual damages, attorney's fees, and additional damages not to exceed $1,000.00. TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(a)(1), (b) (West 2011). Actual damages are those recoverable at common law. ***Beaumont v. Basham***, 205 S.W.3d 608, 619 (Tex. App.–Waco 2006, pet. denied).

**Discussion**

The trial court charged the jury as follows:

A person commits theft of a trade secret if, without the owner's effective consent he knowingly:

    (1)  steals a trade secret; or
    (2)  communicates or transmits a trade secret.

Helfand and Team Works voluntarily delivered the data and analysis that constituted a trade secret to Sepco under the confidentiality agreement. Helfand strenuously insists that her consent was not effective, because it was procured by an elaborate and sinister scheme contrived for that purpose. However, we have found no evidence in the record from which it might reasonably be inferred that Sepco tricked Helfand and Team Works into making the February 15, 2005 presentation so that it could steal Helfand's proprietary data. Rather, the record shows that before February 15, 2005, Sepco was reluctant to entertain a James Lime venture while Team Works was eager to secure Sepco's participation because of Sepco's size, expertise, and activity in the area.

Sepco returned all the materials to Helfand. There is no evidence that it "deprived' her of her trade secrets as "deprived" is defined in the penal code. Nor is there any evidence that on or before February 15, 2005, Sepco had the requisite intent to deprive her of her trade secret. There is also no evidence that Sepco communicated or transmitted Helfand's trade secret.

The jury's finding that Sepco committed theft of Helfand's trade secret has no support in the record. Sepco's first issue, as it pertains to that finding, is sustained.

**3.  BREACH OF CONTRACT**

In its answer to Question No. 11 of the court's charge, the jury found that Sepco failed to comply with the provisions of the confidentiality agreement. In Question No. 12, the court asked the jury to determine the damages to Helfand and Muncey from that breach considering only the value of the trade secret to Helfand and Muncey.

Sepco attacks the jury's finding that it breached the confidentiality agreement. Sepco emphasizes that, under the confidentiality agreement, it had three obligations: (1) to use the confidential information solely for the evaluation of the Pearson prospects, (2) not to disclose that information to third parties, and (3) not to acquire any leases within the Pearson boundaries

22

without giving Team Works the right of first refusal. Sepco insists it fulfilled all three obligations.

We have already addressed Sepco's challenge to Helfand's common law misappropriation of trade secret claim. We explained our conclusion that there was evidence from which the jury might reasonably have inferred that, during the one year term of the agreement, Sepco's use of the confidential information went beyond an evaluation of the Pearson prospects. Instead, Sepco misused that information to plan an ambitious and almost unbelievably successful James Lime development. The jury's finding that Sepco failed to comply with the provisions of the confidentiality agreement is supported by the evidence. Sepco's first issue, as it pertains to Helfand's breach of contract claim, is overruled.

<u>STATUTE OF LIMITATIONS</u>

In its second issue, Sepco maintains that Helfand and Muncey's claims of misappropriation and theft of a trade secret are barred by limitations.

**Applicable Law**

"Statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." ***Exxon Corp.***, 348 S.W.3d at 202. A person must bring suit for misappropriation of a trade secret no later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. Tex. Civ. Prac. & Rem. Code Ann. § 16.010(a) (West 2002). The discovery rule, here incorporated in the statute, tolls limitations until a claimant learns or in the exercise of reasonable diligence should have learned of a wrongful injury. ***PPG Indus. v. JMB/Houston Ctr.***, 146 S.W.3d 79, 93 (Tex. 2004). Thereafter, limitations begins to run "even if the claimant does not know (1) the specific cause of the injury, (2) the party responsible for it, (3) the full extent of it, or (4) the chances of avoiding it." ***Id***. at 93–94. The discovery rule requires a plaintiff to seek information about her injuries and their cause once she learns facts that would make a reasonably diligent person seek such information. ***Childs v. Haussecker***, 974 S.W.2d 31, 47 (Tex. 1998). Tolling of the limitations statute ends when the party claiming the benefit of the discovery rule learns of facts or circumstances that would cause a reasonable person to make inquiry leading to the discovery of a cause of action. ***Pirtle v. Kahn***, 177 S.W.3d 567, 571 (Tex. App.–Houston [1st Dist.] 2005, pet. denied).

23

The start of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record. *Childs*, 974 S.W.2d at 44. However, inquiries such as when a plaintiff discovered or should have discovered the cause of her injury or whether a particular plaintiff exercised due diligence in discovering it are questions of fact. *Id*. The same is true when the statute is tolled by fraud. *Stonecipher's Estate v. Butts Estate*, 591 S.W.2d 806, 809 (Tex. 1979).

Limitations is an affirmative defense, and the party relying on it has the burden of pleading limitations and proving it at trial. TEX. R. CIV. P. 94.

**Discussion**

Helfand filed suit against Sepco on February 17, 2009. Therefore, Sepco had the burden of proving that Helfand knew or should have known of her wrongful injury before February 17, 2006.

Helfand testified that she first learned of Sepco's misappropriation in January 2009 through discovery undertaken when this suit was focused on other entities. At that time, she began a review of the wells Sepco had drilled or participated in during the previous two years. She discovered that Sepco had drilled or participated in drilling scores of James Lime wells in or near her sweet spots.

Helfand's focus was the James Lime. The primary object of her research was to determine those locations most favorable to gas production by horizontal drilling in that formation. Her analysis led her to nineteen sweet spots, later reduced to ten. She had last dealt with Sepco in 2005 when she solicited Sepco's participation in a James Lime well in the Pearson prospects – one of her sweet spots. She shared her comprehensive knowledge of the James Lime throughout the five counties to enhance the credibility of her methodology.

Helfand knew that Sepco had not drilled a James Lime well before her February 2005 presentation, although they were active in the area, chiefly in the Cotton Valley and the Travis Peak formations. She knew they had drilled a Travis Peak well in one of her sweet spots. When she received no positive response from Sepco within a month and a half after the February 15, 2005 presentation, she began the ultimately successful negotiations to sell the Pearson prospects to Petrohawk.

Sepco cites several emails Helfand sent in May 2005 when she was trying to provide Petrohawk with the information it requested in a May 4, 2005 meeting. She was frustrated by

24

Sepco's failure to return all the materials provided Sepco at the February presentation. In one email, she said, "I fear that the concepts and methodology that I have spent years in developing are now being used by entitled parties." In others, she said, "I told Leon something was wrong," and "[i]t was becoming obvious to me that something was not right." She worried that Sepco had been provided "sufficient color-coded, cross-referenced material to completely map the Pettet, Travis Peak and James . . . ." On May 2005, only days after these emails, Sepco returned all the materials with assurances that it retained nothing.

After its February 2005 meeting with Helfand, Sepco continued drilling in the Cotton Valley and the Travis Peak. According to Sepco's evidence, it did not complete a James Lime well until after October 2007. Thereafter, Sepco embarked upon an intensive drilling program in the James Lime in locations that matched Helfand's sweet spots. Helfand was aware that Sepco had the opportunity to misappropriate her data and analysis when she made her presentation on February 5, 2005. The same risk accompanied any presentation to sell the Pearson prospects. She was understandably angry and frustrated with Sepco's tardiness in returning all of her material and the resulting delay in closing the Petrohawk deal. She received the material within a few days with Sepco's assurance that they had kept nothing. Helfand was entitled to rely on this assurance. *See Al Parker Sec. Co. v. Owen*, 1 S.W.2d 271, 272 (Tex. Comm'n App. 1928, judgm't adopted). Despite her expressed fear and frustration with the return of all the materials, Helfand had no objective reasonable basis for further inquiry into Sepco's conduct.

If Helfand had determined to make further inquiries before October 2007, her investigation would have disclosed absolutely nothing. The pattern of wells in the sweet spot locations would not have been evident until much later. Sepco's declaration of the James Lime as a drilling objective was an internal matter. Sepco drilled no James Lime well until October 2007, well within the limitation period. The pattern of James Lime wells clustered in her sweet spot locations would not be apparent for many months thereafter. Inquiry would not have disclosed "wrongful" injury.

There is no evidence in the record that conclusively demonstrates Helfand knew or should have known that Sepco had misappropriated her trade secret before February 16, 2006, three years before she sued Sepco. The jury was entitled to rely on Helfand's testimony that she discovered the misappropriation in January 2009.

25

Sepco's second issue is overruled.

## EXCLUSION OF PRIOR PLEADINGS

In its third issue, Sepco contends the trial court erred in excluding Helfand's prior pleadings in which she accused sixteen parties other than Sepco of conspiring against her to steal her trade secrets.

## Standard of Review and Applicable Law

The decision to admit or exclude evidence lies within the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). An appellate court must sustain the trial court's ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

To obtain reversal of a judgment based on the trial court's error in excluding or admitting evidence, the complaining party must show that the error probably resulted in an improper judgment. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). TEX. R. APP. P. 44.1(a)(1). An appellate court must review the entire record to determine whether the excluded evidence resulted in the rendition of an improper judgment. *Interstate Northborough P'ship*, 66 S.W.3d at 220. The trial court's error in the exclusion of evidence generally will not be reversible unless the excluded proof is "controlling on a material issue." *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

"All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 402. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

Abandoned or superseded pleadings are admissible against the pleader as admissions by a party–opponent. TEX. R. EVID. R. 801(e)(2); *Bay Area Healthcare*, 239 S.W.3d at 235. Such

pleadings are admissible even if they are not inconsistent with the party's position at trial. *Id*. Although qualifying as party admissions, they must be relevant and must not transgress other rules of evidence that may limit their admissibility. *Id*.

**Discussion**

Sepco points to Helfand's allegations in six petitions that the various entities she had sued "had extensive business connections among themselves," "spun a web of illegal and wrongful actions to capture Mrs. Helfand's valuable trade secrets" through "intertwined actions" making them all "jointly and severally liable" for all her alleged damages. Sepco stresses that Helfand accused virtually everyone who had helped her in her efforts—partners, land bank members, and investors—of disloyalty, breach of fiduciary duty, incompetence, or theft. Sepco insists the allegations in the superseded or abandoned pleadings bear on her credibility as well as on the issue of whether disclosure had vitiated her trade secret's protected status.

Standing alone and unamplified, the superseded pleadings offer but slight proof bearing on the determinative issues. But their introduction would have served to suggest that Helfand was suspicious, litigious, and generally undeserving. The insinuation that one is litigious or claims–minded is inflammatory and unfairly prejudicial. *Austin Road Co. v. Ferris*, 492 S.W.2d 64, 74 (Tex. Civ. App.–Fort Worth 1973, writ ref'd n.r.e.). The allegations in the prior pleadings could not reliably detract from Helfand's credibility unless further evidence showed them to be false or unfounded. This would have invited trials within an already lengthy trial in order to litigate matters not otherwise relevant. Undue delay would have been almost unavoidable.

Moreover, the introduction of the superseded pleadings would have risked distracting the fact finder from the issues by provoking speculation regarding the disposition or settlement of the cases against the former defendants.

Sepco saw advantage in using the superseded pleadings to portray Helfand as quarrelsome and litigious. However, the trial court did not keep the jury ignorant of Helfand's contentiousness. Sepco attributes the jury's "exoneration" of Leon Wells to evidence that Helfand was "critical" of her partner, Grimes. There was evidence that she accused her partner, Wells, of fraud; that she accused the "land bank" (the group who funded her leasing) of conduct "resulting in the loss of the most valuable asset," causing a "land-bank revolt"; and that she was critical of all the "companies who have worked . . . on either her methodology or the James Lime."

27

The lone authority Sepco cites to support its position, ***Caffe Ribs v. State***, is inapposite. 328 S.W.3d 919 (Tex. App.–Houston [14th Dist.] 2010, no pet.). ***Caffe Ribs*** was a condemnation case. ***Id***. at 921. The State's value witness was allowed to testify that the subject property was contaminated with hazardous materials and its value diminished. ***Id***. at 925. However, the trial court excluded evidence of a highly relevant Environmental Remediation Agreement in which the landowner's predecessor in title had agreed to pay the cost of remediation. ***Id***. at 927. The court of appeals reversed and remanded. ***Id***. at 933. ***Caffe Ribs*** did not involve an abandoned or superseded pleading.

The slight probative value and minimal relevance of the excluded pleadings was substantially outweighed by the danger of unfair prejudice, confusion of the issues and undue delay. *See* TEX. R. EVID. 403. The trial court did not abuse its discretion in excluding the pleadings. Sepco's third issue is overruled.

## CHARGE ERROR

In its fourth issue, Sepco complains of multiple errors in the jury charge.

### Standard of Review and Applicable Law

The trial court's decision to submit or refuse to submit a particular jury charge is reviewed for abuse of discretion. *See **Shupe v. Lingafelter***, 192 S.W.3d 577, 579 (Tex. 2006). The question on appeal is whether the charge was reasonably necessary to enable the jury to reach a proper verdict. *See **id***. A proper instruction must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. ***Columbia Rio Grande Health Care, L.P. v. Hawley***, 284 S.W.3d 851, 855-56 (Tex. 2009).

If the reviewing court finds error in the charge, it must examine the pleadings, evidence, and the entire charge to determine if the error was harmful. ***Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n***, 710 S.W.2d 551, 555 (Tex. 1986). The error is reversible only if it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. ***Id***.; *see also* TEX. R. APP. P. 44.1.

### Discussion

Sepco complains that the trial court "erroneously defined two types of fraud." We need not address this issue, however, because we have already determined that there is insufficient evidence to support Helfand's fraud claim. The issue should not have been submitted.

28

Sepco also contends that the trial court erred in failing to submit or in submitting various instructions in the jury charge and in including Muncey in the charge.

## 1. DRAINAGE INSTRUCTION

Sepco requested the following instruction setting out its obligation to protect its royalty owners from drainage:

> An oil and gas company owes its royalty owners protection from drainage. The oil and gas company must protect those royalty owners by performing any act that a reasonably prudent operator would perform under similar circumstances, including the drilling of additional wells.

One of the reasons Sepco offered for its entrance into the James Lime was the success of the Cabot well in which it had a 15% interest. It contended that it was thereafter obligated to begin drilling the James Lime because its leases abutted other Cabot leases. It offered no proof of an actual duty to protect from drainage or that a reasonably prudent operator would have drilled an offset well. *See Alexander*, 622 S.W.2d at 567-68. Its proof consisted of its petroleum engineer's testimony that it "perhaps" drilled "some" wells "in part" to prevent drainage. Most of Sepco's leases in that area (one of Helfand's sweet spots) did not abut Cabot's leases. The requested instruction would have placed more emphasis on the alleged drainage risk than it merited from the evidence. And, as Helfand argues, the potential for drainage from its leases adjoining Cabot could hardly explain "why, out of the myriad possible locations in a multi-county James Lime play, Sepco's wells landed in Helfand's sweet spots." The requested instruction would not have assisted the jury.

## 2. CONSENT INSTRUCTION

Sepco also requested the court to instruct the jury that Helfand consented to Sepco's use of her trade secret after the one year term of the confidentiality agreement. Their proposed instruction reads as follows:

> You are instructed that Helfand consented to any use of the information shared pursuant to the Confidentiality Agreement after February 14, 2006 by agreeing that "the Agreement shall terminate and be of no further force and effect twelve (12) months following the Effective Date."

29

The requested instruction appears simply to state the converse of Sepco's covenant to use the confidential information solely for the evaluation of the Pearson prospects during the term of the agreement. But the requested instruction's emphasis on Helfand's consent can perhaps suggest the agreement gave greater latitude in the use of Helfand's secrets than Sepco's own witnesses expressed.

Matt Williams was the Sepco geologist present at the February 15, 2005 meeting with Team Works and one of the architects of Sepco's James Lime drilling program. The following exchange took place during the cross examination of Matt Williams:

> Would it be a fair statement to say that Southwestern's [Sepco's] policy with regard to confidential information presented pursuant to confidentiality agreement is that upon the expiration of 12 months or the stated period of the agreement, that [Sepco] is free to use this information?
>
> Williams: . . . . I guess I'm saying we do not view ourselves as being just free to do whatever we want after that month period, you know.

The confidentiality agreement restricted Sepco's use of Helfand's trade secret to the evaluation of the Pearson prospects. It may reasonably be inferred from the evidence that Sepco, during the twelve months following the agreement's execution, used Helfand's trade secret as the basis to declare the James Lime as a drilling objective, to map the James Lime, and to mark its maps with Helfand's sweet spots. It began a leasing program that targeted Helfand's sweet spots, acquiring a substantial number of leases during the twelve months following the agreement's execution. The agreement should not be interpreted to allow Sepco, impressed with the validity of Helfand's information, to use it, not solely for the evaluation of the Pearson prospects, but to plan and lay the groundwork for a vast James Lime development to be implemented later when resources became available. Nor should Sepco escape liability because the plan's final fruition, the completion of the wells, did not occur until after the anniversary of the agreement. The requested issue was unnecessary. The trial court did not abuse its discretion in refusing to submit the instruction.

### 3. DAMAGES INSTRUCTION

Next, Sepco contends the trial court erred in not submitting an issue that required the jury, in assessing damages, to "consider only those profits that were earned as a result of uses or

disclosures occurring between February 15, 2005, and February 15, 2006." Damages in misappropriation of trade secret cases are not necessarily calculated from or restricted to the defendant's profits. *See, e.g., **Univ. Computing Co. v. Lykes–Youngstown Corp.***, 504 F.2d 518, 535 (5th Cir. 1974). The trial court did not err in refusing the instruction.

### 4. "IMPROPER MEANS" INSTRUCTION

Sepco complains that the trial court abused its discretion by instructing the jury that a trade secret can be misappropriated by any means that are "wrongful" in any way. The instruction stated that "[a] defendant misappropriates a trade secret if he discloses or uses it [after] (1) the defendant learns about the trade secret through improper means." "Improper means" was then defined, as follows:

> "Improper means" are actions that fall below the generally accepted standards of commercial morality and reasonable conduct. Improper means of acquiring another's trade secrets include theft, fraud, breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case.

There was no dispute that Helfand disclosed her proprietary information to Sepco pursuant to the confidentiality agreement. Except for the initial sentence in the definition, "[i]mproper means are actions that fall below the generally accepted standards of commercial morality and reasonable conduct," the definition comes from the Restatement (Third) of Unfair Competition Section 43 (1995). The initial sentence of the charge definition was unnecessary. But its inclusion in the instruction was harmless.

### 5. "BREACH OF CONFIDENCE" INSTRUCTION

Sepco contends further that the trial court erred in instructing the jury that "[a] defendant misappropriates a trade secret if . . . (2) the defendant's disclosure or use of the trade secret constitutes a breach of confidence reposed in him. . . ." The charge then defines "breach of confidence" to include breach of an "implied obligation." More particularly, the instruction states that "'[b]reach of confidence' means that the person making the disclosure is violating an express promise of confidentiality OR an implied obligation pursuant to a fiduciary or confidential relationship." The record clearly shows Sepco's express promise of confidentiality. But no fiduciary or other implied confidential relationship existed between Sepco and Helfand.

That part of the instruction defining breach of confidence to include breach of an implied or fiduciary obligation was superfluous, and the trial court erred in submitting it over Sepco's objection. However, we have reviewed the pleadings, the evidence, and the balance of the charge, and we conclude that the harm, if any, did not result in an improper judgment.

## 6. INCLUSION OF MUNCEY

Finally, Sepco complains that Muncey should not have been included in the jury charge. Muncey was not a party to Team Works' confidentiality agreement, he had no relationship, fiduciary or otherwise, with Sepco, and there was no evidence of fraudulent acts by Sepco against Muncey. Nevertheless, under the charge submitted, the jury awarded both Muncey and Helfand damages for breach of fiduciary duty, fraud, and breach of the confidentiality agreement. Since we have sustained Sepco's challenge to Helfand's and Muncey's recovery on those three theories of liability, we need not address Sepco's complaints regarding the apparent "incoherence" of awarding Muncey damages based on causes of action Muncey did not have.

However, Muncey's testimony that he owned a 20% share in the trade secret was uncontradicted. We have upheld Helfand and Muncey's claim of misappropriation of a trade secret. Because Muncey owned a share of the trade secret, he is entitled to recover his damages from Sepco for its misappropriation.

Sepco's fourth issue is overruled.

## DAMAGES

In its fifth issue, Sepco argues that the evidence does not support the jury's finding of $11,445,000 in actual damages. Sepco also contends that the testimony of Helfand's damages expert should have been excluded and that the award of damages for breach of contract was improper.

### Trade Secret Misappropriation Damages

Damages in trade secret cases can take a variety of forms. The variety of approaches demonstrates the "flexible and imaginative" methods employed. *Univ. Computing*, 504 F.2d at 538.[1] The methods used to calculate damages include the value of the plaintiff's lost profits,

---

[1] *University Computing* was decided under the Georgia law of trade secrets. The factors originally articulated in the Restatement of Torts Section 757 (1939) are the foundation for both Georgia and Texas law on

*Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 89-90 (Tex. 1973); the defendant's actual profits from the use of the secret, *Elcor Chem-Corp. v. Agri-Sul, Inc*., 494 S.W.2d 204, 214 (Tex. Civ. App.–Dallas 1973, writ ref'd n.r.e.); the value that a reasonably prudent investor would have paid for the trade secret, *Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp*., 435 F.2d 1262, 1263-64 (5th Cir. 1970); the development costs the defendant avoided by the misappropriation, *Univ. Computing*, 504 F.2d at 535-36; and a "reasonable royalty," *Elcor Chem. Corp*., 494 S.W.2d at 214. Courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the defendant's use of the trade secret. *Univ. Computing*, 504 F.2d at 538. "Each case is controlled by its own peculiar facts and circumstances." *Id*. (quoting *Enterprise Mfg. Co. v. Shakespeare Co*., 141 F.2d 916, 920 (6th Cir. 1944)).

### *Loss to Plaintiff*

In some instances, courts have attempted to measure the value of the trade secret misappropriated by the loss to the plaintiff. *See, e.g.*, *Jackson*, 499 S.W.2d at 89–90. In most cases, except for the change in their competitive positions, the defendant has used the secret to his advantage with no obvious effect on the plaintiff. *Id*. The value of what has been lost by the plaintiff is usually measured by lost profits. *Id*. However, the plaintiff can seldom establish a specific injury such as lost sales and lost profits with the reasonable certainty required. *Id*. at 536. In the absence of such proof, the loss to the plaintiff is not helpful in calculating the value of the trade secret. *Id*.

### *Value to Defendant*

Where the plaintiff is unable to prove a specific injury, and the value of the trade secret has not been destroyed, the accepted approach measures the value of the misappropriated trade secret to the defendant, expressed as "the benefits, profits, and advantages" gained by the defendant in the use of the trade secret. *Id*. (quoting *Int'l Indus., Inc. v. Warren Petroleum*, 248 F.2d 696, 699 (3d Cir. 1957)). The law looks to the time when the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to commercial use. *Id*.

---

trade secrets. Additionally, other courts deciding cases under Texas law have relied on *University Computing*. *See e.g., Garth v. Staktek Corp*., 876 S.W.2d 545, 548 (Tex. App.–Austin 1994, writ dism'd w.o.j.), and *Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1199 (5th Cir. 1986).

Where profits can be proved from the trade secret's use, the defendant's actual profits are used in the calculation of damages. *Id*. However, a lack of profit from his misappropriation and use of the secret will not exempt the wrongdoer from liability in the amount of the trade secret's value when it was misappropriated. *Id*.

*Reasonable Royalty*

To calculate the trade secret's value to the defendant in the absence of proof of the plaintiff's loss, courts adopt the fiction that a license or royalty was to be granted at the time of the misappropriation. *Id*. at 537. The court then determines what the parties would have agreed upon for the use of the trade secret at the time the misappropriation took place if both had been reasonably trying to reach an agreement. *Id*. (quoting *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir. 1928)); *see also Fourtek*, 790 F.2d at 1208.

The use of a "reasonable royalty" in the calculation of damages in trade secret misappropriation cases was borrowed from patent infringement cases. *See generally, e.g.*, *Egry Register Co. v. Standard Register Co*., 23 F.2d 438 (6th Cir. 1928). In *Egry Register*, the defendant made and sold cash registers that in part used the plaintiff's device to roll paper through the machine. *Id*. at 439. At trial, the plaintiff was awarded the defendant's total profits on all sales of machines using the plaintiff's device. *Id*. The court held that this was an improper measure of damages since the plaintiff's device was but a small component of the infringing defendant's machine. *Id*. at 441. There was no evidence from which an apportionment of the profits attributable to the invention could be shown. *Id*. at 442. The court concluded that damages based upon a reasonable royalty offered the most equitable method of determining the portion of the defendant's profits that should be credited to the plaintiff's invention. *Id*. "To adopt a reasonable royalty as the measure of damages is to adopt . . . the fiction that a license was to be granted at the time of the beginning of the infringement, and then to determine what the license price should have been." *Id*. at 443. "In fixing a reasonable royalty, the primary inquiry . . . is what the parties would have agreed upon, if both were reasonably trying to reach an agreement." *Id*.

The measure of value adopted will vary with the nature of the secret as well as other factors. In another patent case, *Georgia-Pacific Corp. v. United States Plywood Corp*., 318 F.Supp. 1116 (S.D.N.Y. 1969), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971), the court set out fifteen factors considered in other leading cases in determining a reasonable royalty. *Id*. at 1120.

In most cases, the *Georgia-Pacific* method attempts to set a percentage royalty rate, which is then multiplied by the dollar amount of infringing sales to calculate the dollar amount of "reasonable royalty" damages. Several of the factors listed are particularly germane to our case.

1. The royalties received by the patent owner for the licensing of the patent in suit, proving or tending to prove an established royalty;

2. The rates paid by the license for the use of other patents comparable to the patent in suit;

. . . .

11. The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use;

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13. The portion of the profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

*Georgia-Pacific Corp*., 318 F.Supp. at 1120.

"Reasonable royalty" does not necessarily mean a simple percentage of the defendant's profits on actual sales; instead, it is intended to measure the actual value of what has been misappropriated. *Fourtek*, 790 F.2d at 1208.

The fact finder's task is simplified and a more exact appraisal possible if the parties previously have agreed tentatively on a licensing price as in *Vitor Corp. v. Hall Chemical Co.*, 292 F.2d 678, 682 (6th Cir. 1961), where an "agreement in principle" established the amount of the royalty, or if some industry standard provides a clear measure. *Univ. Computing*, 504 F.2d at 539. Some degree of speculation is inherent in a calculation relying on a hypothetical licensing agreement. *Alcatel USA, Inc. v. Cisco Sys., Inc*., 239 F.Supp.2d 660, 669 (E.D. Tex. 2002).

### *Discussion*

Helfand called Keith Selinger, a reservoir engineer with forty-five years of experience in the oil and gas industry, to testify to the total net revenues Sepco could reasonably be expected to gain from its exploitation of Helfand's trade secret. He was then asked what fraction or percentage of those total revenues should be apportioned to Helfand as the value of what Sepco

gained from its misappropriation. The resulting calculation, Selinger testified, represented Helfand's damages.

Selinger first testified that the total accrued revenues from 144 Sepco wells previously identified as drilled in Helfand's sweet spots amounted to $382 million. In order to calculate the present value of the projected revenue from those wells, Selinger relied on the production history of each well as reported to the Texas Railroad Commission and the reported prices for oil and gas. He calculated the production decline curve for each well to estimate future production using a method standard in the industry for ninety years. Selinger deducted severance and ad valorem taxes and monthly operating expenses that varied with the depth of the well. He discounted the value of future proceeds to arrive at the present value of projected revenues.

Selinger calculated that part of past and projected revenues representing Sepco's gain from its misappropriation attributable to Helfand's trade secret, as distinguished from those revenues referable to Sepco's own contribution of risk capital, equipment, expertise, and other elements. In doing so, he applied the percentage compensation formula used in Helfand's prospect identification agreement with Petrohawk. That agreement primarily provided that Helfand would receive, on those prospects she designated for Petrohawk, a 3% overriding royalty interest and 6.25% "back in" interest after payout that might vary depending on the royalty burden borne by the well. Selinger calculated 3% of the total net revenues. He then determined the projected payout of the wells and applied 6.25% to the revenues after payout. Selinger added these figures to arrive at damages from the 144 wells of $35,338,877.

Selinger testified that Helfand was also entitled to 3% of Sepco's $355 million sale of the deep rights under its Exxon leases to Exco. Helfand's damages related to the sale of the deep rights (Haynesville and Bossier Shale), Selinger testified, were $10.65 million. According to Selinger, Helfand's total damages amounted to $45,988,877.

During cross examination, Selinger conceded that the Reavley No. 1 well should not have been included in his calculations.

The jury found damages of $11,445,000. It is apparent that the jury reached this figure by calculating 3% of the revenues of $381.5 million *accrued,* an amount only slightly lower than the $382 million that Selinger testified had been reported already to the Railroad Commission at the time of trial.

Sepco assails Selinger's testimony as suffering from too many unfounded assumptions, inconsistencies with known facts, and bald assertions. The sum of his testimony is so unreliable, it argues, that it amounts to no evidence.

Sepco claims that Selinger did not know his case, because, in a pretrial report, his damage calculation had included many wells unrelated to Helfand's claim. Selinger acknowledged in his direct testimony that Helfand's attorneys designated the 144 wells he evaluated in making his damage calculation. Although it provided grist for the cross examiner's mill, Selinger's revision of his pretrial report to delete twenty-nine wells included in error does not invalidate the report introduced at trial or his trial testimony. It was not Selinger's job to designate the wells Sepco located through misuse of Helfand's trade secret. Helfand identified the subject wells with exhibits that matched each well with a sweet spot.

Sepco next attacks Selinger's use of Helfand's agreement with Petrohawk as the source for the damage formula for the wells in all five counties, although the Petrohawk agreement did not cover Cherokee and San Augustine Counties. Sepco points out that the price for mineral rights varies from county to county. Sepco faults Selinger for not explaining why the same formula was applicable to the Cherokee and San Augustine wells.

Prices paid for minerals and leases may vary widely from place to place and from county to county. However, Selinger's calculations were based on revenue from actual production and would not vary with the price paid for mineral rights or leases. Selinger's task was to calculate the "benefits, profits, or advantages" Sepco gained using Helfand's trade secret. He did this by applying a percentage equivalent to an established "reasonable royalty" in the industry to the present value of net revenues in order to arrive at the value of Helfand's information to Sepco. The Petrohawk agreement, like other prospect identification agreements in the industry, provided that Helfand would be paid out of actual revenues, if any. If the prospects she identified were unsuccessful, she would not be paid. The Petrohawk compensation formula was obviously applicable to all the counties and needed no explanation.

Sepco also claims that Selinger used the wrong formula. Helfand's Prospect Identification Agreement with Petrohawk provided two compensation formulas, one for prospects she found, and the other if Petrohawk located the prospect. If Helfand found the prospect, she received a variable overriding royalty interest in production (that averaged 3%) and a 6.25% percent "back in" working interest. If Petrohawk found the prospect, Helfand

received only the option to buy a 6.25% working interest. Sepco claims it found the prospects it drilled and completed, and therefore Selinger erred in using a formula that assumed Helfand identified the prospects. However, Helfand claimed that Sepco's well locations in her sweet spots were the product of her research and analysis. The jury agreed with her.

Next, Sepco insists that Selinger erred in his damages calculation in assuming a percent of revenues equivalent to a 3% overriding royalty since the Petrohawk agreement provided that the size of Helfand's override could vary depending on existing royalty burdens. However, Helfand had previously testified that, under the agreement, she had received, on average, a 3% overriding royalty interest.

Sepco attacks the reliability of Selinger's damages calculation, because he assumed that Sepco had a 100% working interest in all the subject wells. During cross examination, Sepco's attorney asked Selinger if he was aware that Sepco owned only 36% of the Fincher-Schwartz No. 2 well. Selinger conceded he was not aware of that. Selinger also admitted that he had included the Reavley No. 1 well in his damage model, although Helfand's own testimony showed that Sepco drilled the Reavley No. 1 before she met with Sepco. Other than counsel's question regarding the Fincher Schwartz No. 2, there is no mention in the testimony that Sepco owned less than all the working interest in the other wells. Selinger's error in the inclusion of the Reavley No. 1 in his damage calculation was not so serious as to render the balance of his testimony unreliable.

In his testimony, Selinger calculated damages of 3% of the $355 million sale of deep rights to Exco, the equivalent of a 3% overriding royalty. Sepco argues that this demonstrates the unreliability of Selinger's testimony, because an overriding royalty owner is paid only from production and not from the sale or assignment of rights under the lease. It is clear that Helfand would never receive an overriding royalty in the deep rights sold to Exco. Selinger employed a figure corresponding to a 3% overriding royalty (a percent of gross revenue taken before expenses) as a reasonable royalty on the proceeds of the sale in order to ascertain what, in his opinion, was the portion of the sales price attributable to Sepco's misuse of Helfand's data and methodology. It should be apparent that "royalty," as used in the term "reasonable royalty" for the measurement of damages for trade secret misappropriation, has little relationship to the definition of the word "royalty" in the dictionary.

Stacked-pay potential was an important consideration in Helfand's methodology. But the proof connecting Helfand's trade secret with Sepco's acquisition of the Exxon leases and the subsequent sale of the underlying deep rights was tenuous, at best. It is evident from the jury's verdict that the jurors did not believe that any of the proceeds from the sale of the deep rights were a benefit Sepco derived from Helfand's secrets. Therefore, Sepco's challenge to this aspect of Selinger's testimony is largely irrelevant.

In assessing Helfand's damage, the jury calculated 3% of the undisputed accrued revenues from the wells reported to the Railroad Commission. Three percent was well within the 3% overriding royalty and 6.25% "back in" working interest identified by Selinger and elsewhere in the record as a "customary and reasonable" compensation in the industry for prospect identification.

In his calculation of Helfand's damages referable to the 144 wells in Helfand's sweet spots, Selinger's method was based on sound accounting and reservoir engineering. To apportion the amount of the present value of past and projected future revenues attributable to Sepco's use of Helfand's trade secret, he applied a "reasonable royalty" established in industry practice. *See **Univ. Computing***, 504 F.2d at 539. The Petrohawk prospect identification agreement that he used as a model used the same percentages, involved the same trade secret and stacked-pay formations, and was contemporaneous with Sepco's misappropriation.

Sepco's fifth issue, as it applies to the damages for misappropriation of a trade secret, is overruled.

### Breach of Contract Damages

Although Sepco breached the confidentiality agreement, there is nothing in the record showing that Helfand sustained a specific injury from the breach. She sold the Pearson prospects to Petrohawk for a substantial sum. There is no evidence of opportunities lost or losses sustained attributable to Sepco's breach. The measure of damages Selinger employed (defendant's gain) was proper in calculating Helfand's tort damages for misappropriation of her trade secret. But it is not the appropriate measure of contract damages. "Where a right of action for breach of contract exists, compensatory damages will be given for the net amount of the losses caused or gains prevented in excess of savings made possible. . . ." 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 992 (1964) (quoting RESTATEMENT, CONTRACTS § 329). In the absence of

evidence that Helfand sustained loss or was denied gain by Sepco's breach, there is no basis for the jury's finding of damages for Sepco's breach of the confidentiality agreement.

Sepco's fifth issue, as it relates to damages for breach of contract, is sustained.

## DISGORGEMENT

In its sixth issue, Sepco contends the trial court erred in ordering it to pay Helfand and Muncey $23,888,000 as disgorgement in the addition to the $11,445,000 in actual damages found by the jury.

Courts may fashion equitable remedies such as profit disgorgement to remedy a breach of fiduciary duty. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010). However, the confidentiality agreement between Helfand and Sepco did not create a fiduciary relationship. Nor did a fiduciary relationship arise out of the circumstances attending the agreements' execution. Sepco owed no fiduciary duty to Helfand. Therefore, the disgorgement award was improper.

Sepco's sixth issue is sustained.

## HELFAND'S CROSS-APPEAL

In one cross-issue, Helfand contends the trial court erred by failing to properly assess all of Sepco's ill-gotten gains, basing its disgorgement award on erroneous numbers, and denying a constructive trust. Since we have held that the trial court erred in awarding disgorgement, we need not address this complaint. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

For the reasons set forth above, that part of the judgment awarding Helfand and Muncey $23,888,000 as disgorgement of illicit gains is *reversed* and judgment *rendered* that Helfand and Muncey take nothing as disgorgement. The award of actual damages, insofar as it is based on the jury's findings of breach of fiduciary duty, fraud, breach of contract, and theft of a trade secret is *reversed* and judgment *rendered* that Helfand and Muncey take nothing under those theories of recovery. The award of $11,445,000 to Helfand and Muncey as damages for misappropriation of a trade secret is *affirmed*. The case is remanded to the trial court for the

40

determination and award of attorney's fees to Sepco as the prevailing party under the Texas Theft Liability Act.  In all other respects, the judgment is ***affirmed***.

**B<span>ILL</span> B<span>ASS</span>**
Justice

Opinion delivered July 10, 2013.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired Justice, Twelfth Court of Appeals, sitting by assignment.*

(PUBLISH)

41

# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 10, 2013**

## NO. 12-11-00370-CV

**SOUTHWESTERN ENERGY PRODUCTION COMPANY,**
Appellant/Cross-Appellee

V.

**TOBY BERRY-HELFAND AND GERY MUNCEY,**
Appellees/Cross-Appellants

---

Appeal from the 123rd Judicial District Court
of Shelby County, Texas. (Tr.Ct.No. 06CV-29005)

---

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below,

It is ORDERED, ADJUDGED and DECREED by this court that the portion of the judgment awarding Appellees, **TOBY BERRY-HELFAND AND GERY MUNCEY**, $23,888,000 as disgorgement of illicit gains is *reversed* and judgment is *rendered* that Appellees, **TOBY BERRY-HELFAND AND GERY MUNCEY**, take nothing as disgorgement. The award of actual damages, insofar as it is based on the jury's findings of breach of fiduciary duty, fraud, breach of contract, and theft of trade secrets is hereby *reversed*

42

and judgment *rendered* that Appellees, **TOBY BERRY-HELFAND AND GERY MUNCEY**, take nothing under those theories of recovery.

It is further ORDERED, ADJUDGED and DECREED THAT the judgment be **reversed** and the cause **remanded** to the trial court for the determination and award of attorney's fees to Appellant, **SOUTHWESTERN ENERGY PRODUCTION COMPANY;** in all other respects, the judgment is *affirmed;* and that all costs of this appeal are hereby adjudged one-half against the Appellant, **SOUTHWESTERN ENERGY PRODUCTION COMPANY,** and one-half against the Appellees, **TOBY BERRY-HELFAND AND GERY MUNCEY,** in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

Bill Bass, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired Justice, Twelfth Court of Appeals, sitting by assignment.*